**INTERFACE BIOMEDICAL
LABORATORIES CORP.,
Plaintiff,**

v.

**AXIOM MEDICAL, INC., Defendant.**

**No. 84 Civ. 3447.**

United States District Court,
E.D. New York.

Jan. 11, 1985.

Pennie & Edmonds, New York City, for plaintiff.

Davis, Hoxie, Faithfull & Hapgood, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff in this action seeks injunctive and declaratory relief, and damages, for defendant's activities in connection with the manufacture and marketing of a medical product known as SUPERSTAT.[1] Plaintiff's complaint alleges four claims for relief: (1) for a declaratory judgment that the parties have not entered a joint venture agreement and defendant is not plaintiff's exclusive distributor and licensee ("Count 1"); (2) for injunctive relief restraining defendant from engaging in trade secret misappropriation ("Count 2"); (3) for injunctive relief restraining defendant from engaging in unfair competition ("Count 3"); and (4) for damages for unjust enrichment ("Count 4").

Defendant has moved under Rule 12(b)(2) of the Federal Rules of Civil Procedure for an order dismissing the complaint for lack of personal jurisdiction, and under Rule 12(b)(3) for an order dismissing the complaint for improper venue insofar as Counts 3 and 4 allege patent infringement. For the reasons that follow, defendant's motion is denied with respect to Count 1, and granted with respect to Count 2, 3 and 4. I find it unnecessary to decide defendant's motion with respect to venue.

*Background*

Plaintiff is a New York corporation, with its principal place of business in Brooklyn, New York, engaged in the research and

---

**1.** "SUPERSTAT is a modified collagenous hemostatic sponge which, when introduced into a wound, produces hemostasis ('clotting') of blood vessels and subsequently dissolves such that there is absolutely nothing that a surgeon need remove." Sawyer Aff. ¶ 4.

development of medical products. Plaintiff maintains that it is in the business of licensing patents and associated trade secrets to responsible organizations, but that it is not presently engaged in the sale of medical products. Defendant is a California corporation, with its principal place of business in California, engaged in the manufacture and sale of medical products. Plaintiff has developed a medical product called SUPERSTAT, for which it claims to have acquired various trademarks, patents, trade secrets and other confidential proprietary information. Prior to the events that gave rise to the present action, SUPERSTAT was manufactured by Smith Laboratories Company and marketed by Superstat Corporation, a corporation which was jointly formed by plaintiff and Orange Medical for the purpose of marketing SUPERSTAT. In early 1983, both Smith and Orange withdrew from the manufacture and sale of SUPERSTAT, and plaintiff acquired the rights to manufacture and market SUPERSTAT.

Byron Economidy, the president of defendant, and Philip Sawyer, the president of plaintiff, initially met at a medical convention in San Francisco during June of 1983. Defendant claims that the parties entered into an oral joint venture agreement at that meeting, under which defendant was to manufacture and market SUPERSTAT under an exclusive licensing and distributorship arrangement with plaintiff. Plaintiff claims that the parties merely discussed the "possibility" of such an agreement. Letters exchanged by the parties after the meeting tend to confirm plaintiff's contention. In defendant's June 20, 1983 letter to plaintiff, Economidy stated that he was "excited about the opportunity to *possibly* work with you." Exhibit 1 to Sawyer Affidavit (emphasis added). Plaintiff's responsive letter, dated July 12, 1983, stated: "This letter is sent to you to produce a formal relationship between [plaintiff and defendant] assuming that an attempt will be made by the co-joint companies to market SUPERSTAT.... I would

be willing to consider placing the current manufacturing and marketing of SUPERSTAT in Axiom's hands on the presumption that Impra and Mr. Boyd Baker do not pick up their option on SUPERSTAT." Exhibit 2 to Sawyer Affidavit.

During the following year, Sawyer and Economidy met three times in New York. Plaintiff claims that the parties negotiated the terms of a potential joint venture agreement at all three meetings. Defendant claims that no negotiations with regard to a joint venture agreement occurred at any of the three meetings. The parties agree that at the first meeting, in July 1983, Sawyer demonstrated the use of SUPERSTAT in surgery; at the second meeting in October 1983, the parties discussed certain matters unrelated to the SUPERSTAT agreement; and the third meeting in May 1984 occurred at a trade convention. During the same time period, the parties and their attorneys engaged in numerous written and telephonic communications with regard to the negotiation of a written joint venture agreement. Also during this period, plaintiff sent defendant various trademarks, existing inventories of SUPERSTAT, and information on trade secrets and processes involved in the manufacture of SUPERSTAT. Defendant subsequently contracted for the manufacture of SUPERSTAT by a third party, and began selling the product.

On July 20, 1984, plaintiff sent the defendant a letter withdrawing "all offers and proposals" and demanding that defendant cease and desist from making, using, selling, or offering for sale any products involving plaintiff's patents, trademarks and know-how. Exhibit 5 to the Sawyer Affidavit. Defendant responded in a letter dated July 27, 1984, asserting that the parties had entered into a joint venture agreement regarding the manufacture and marketing of SUPERSTAT, advising plaintiff that defendant intended to continue its marketing of SUPERSTAT, and formally

refusing to comply with the demands expressed in the July 20, 1984 letter.[2]

In a letter to the Food & Drug Administration dated July 30, 1984, defendant stated:

> Axiom Medical, Inc., as exclusive distributor and licensee under Interface Biomedical Laboratories Corp., for the manufacture of SUPERSTAT, is requesting permission to have a new additional manufacturing site for our SUPERSTAT Hemostatic Collagen Sponge.

Exhibit 6 to the Sawyer Affidavit. Plaintiff's attorney admitted at oral argument that defendant has not manufactured SUPERSTAT since it received plaintiff's July 20, 1984 letter, but states that he has reason to believe that defendant is seeking to manufacture SUPERSTAT outside the United States. Transcript of Oral Argument held on October 26, 1984, at 28–29.

### Discussion

In determining the amenability of a foreign corporation to a suit in federal district court, the court must apply the standards for personal jurisdiction of the state in which it sits. *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir.1963); *Round One Productions Inc. v. Greg Page Enterprises, Inc.*, 566 F.Supp. 934, 935–36 (E.D.N.Y.1982). Defendant has conceded that the assertion of jurisdiction in this case would be constitutional. Therefore, the only question remaining for determination is whether "long-arm" jurisdiction can be asserted in this case under § 302 of the New York Civil Practice Law and Rules ("CPLR").[3] The court must "determine the issue of personal jurisdiction separately for each cause of action asserted in [the plaintiff's] complaint." *Sterling Television Presentations v. Shintron*, 454 F.Supp. 183 (S.D.N.Y.1978). *Cf. Darby Drug Company, Inc. v. Zlotnick*, 573 F.Supp. 661 (E.D.N.Y.1983) (finding personal jurisdiction for causes of action for misappropriation of corporate opportunity and breach of fiduciary duty, but no personal jurisdiction for causes of action for misappropriation of trade secrets); *R.F.D. Group Limited v. Rubber Fabricators, Inc.*, 323 F.Supp. 521 (S.D.N.Y.1971) (finding personal jurisdiction with respect to causes of action for copyright violations, trademark violations and unfair competition through the sale of products in New York, but no personal jurisdiction with respect to causes of action for breach of contract and unfair competition by the wrongful appropriation of trade secrets).

### A.  Count 1

C.P.L.R. § 302(a) provides:

Acts Which Are the Basis of Jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or

\*     \*     \*     \*     \*     \*

(3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act if he

(i) regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

---

**2.** Curiously, neither party submitted a copy of the July 27, 1984 letter from defendant to plaintiff.

**3.** CPLR 302 does not extend jurisdiction as far as may be constitutionally permitted. *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 435 (2d Cir.1971); *Liquid Carriers Corp. v. American Marine Corp.*, 375 F.2d 951, 955 (2d Cir.1967); *Kramer v. Vogl*, 17 N.Y.2d 27, 32, 267 N.Y.S.2d 900, 904, 215 N.E.2d 159, 162 (1966).

■ Plaintiff claims that the three meetings between the parties which took place in New York constitute a transaction of business in New York sufficient to establish personal jurisdiction with regard to Count 1—the cause of action for declaratory judgment. The defendant contends that a joint venture agreement was created when the parties met in San Francisco, no negotiations occurred at the later three meetings in New York, and therefore, there was no transaction of business sufficient to establish jurisdiction.

The Second Circuit has stated:

In deciding a pretrial motion to dismiss for lack of personal jurisdiction, a district court has considerable leeway. It may determine the motion on the basis of affidavits alone, or it may permit discovery in aid of the motion, or it may conduct an evidentiary hearing on the merits of the motion.... If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials. Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party to defeat the motion.

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981) (*citing Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56 (2d Cir.1981); *Welsh v. Gibbs*, 631 F.2d 436, 438–39 (6th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)).

When a court decides a motion to dismiss for lack of personal jurisdiction on the basis of affidavits and pleadings alone, it must resolve all doubts raised by the papers in the light most favorable to the plaintiff. *Round One Productions, Inc. v. Greg Page Enterprises, Inc.*, 566 F.Supp. 934 (E.D.N.Y.1982); *American Contract Designers, Inc. v. Cliffside, Inc.*, 458 F.Supp. 735 (S.D.N.Y.1978). This Court will therefore treat the plaintiff's complaint and the Sawyer Affidavit as true for purposes of deciding this motion.[4]

The New York Court of Appeals has held that even a single transaction of business in New York, out of which the cause of action has arisen, may be sufficient for the assertion of longarm jurisdiction under C.P.L.R. § 302(a)(1). *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 456, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75, *cert. denied sub nom. Estwing Mfg. Co. v. Singer*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). It has been said that the "relevant inquiry is whether the defendant has performed 'pur-

---

**4.** In any event, I find it difficult to credit the assertions made by defendant through the Economidy affidavit. Economidy claims that when he and Sawyer met "for the very first time" at a San Francisco trade show, they entered into an agreement to form a joint venture to manufacture and market SUPERSTAT. Economidy Aff. ¶¶ 8, 11. This rather extraordinary claim is contradicted by the June 20, 1983 and July 12, 1983 letters exchanged by the parties, which indicate that the parties did not believe that any binding agreement had been formed in San Francisco. Defendant contends that these letters were phrased in tentative language because the joint venture agreement was contingent upon certain third parties failing to exercise options on SUPERSTAT. This, too, is contradicted by the July 12, 1983 letter from Sawyer to Economidy: "I would be *willing to consider* placing the current manufacturing and marketing of Superstat in Axiom's brands on the assumption that Impra and Mr. Boyd Baker do not pick up their option on Superstat." Exhibit 2 to Sawyer Aff. (emphasis added). The veracity of Economidy's claim that a joint venture agreement was formed in San Francisco is also called into doubt by Economidy's admission that "[i]n a letter dated September 1, 1983, Sawyer suggested that IBML and Axiom document their joint venture arrangement in a formal written agreement. Soon thereafter, attorneys for Axiom and IBML prepared and exchanged (via the mail), formal written proposed agreements. I discussed these proposed agreements with Sawyer during numerous telephone conversations and at certain trade conventions outside New York State." Economidy Aff. ¶ 15.

poseful acts' in New York 'in relation to the contract, albeit preliminarily or subsequent to its execution.'" *American Contract Designers*, 458 F.Supp. at 739, *citing Longines-Wittnauer*, 15 N.Y.2d at 457, 261 N.Y.S.2d at 18, 209 N.E.2d at 75. Accordingly, courts have held that a defendant's presence in New York to negotiate a contract, which formed the basis of the cause of action, is sufficient for purposes of longarm jurisdiction. *Liquid Carriers Corp. v. American Marine Corp.*, 375 F.2d 951 (2d Cir.1967); *Round One Productions*, 566 F.Supp. at 937; *Bastille Properties, Inc. v. Hometels of America, Inc.*, 476 F.Supp. 175, 177 (S.D.N.Y.1979); *American Contract Designers, Inc.*, 458 F.Supp. at 739. As one court has explained:

> "Under *Liquid Carriers Corp. v. American Marine Co.*, 375 F.2d 951, 955–956 (2nd Cir.1967), any contract negotiations evidencing a purposeful invocation of the laws of the foreign state are transactions of business for purposes of the longarm statute. It does not matter whether the negotiations are preliminary, or whether the contract is executed in New York, or whether the performance is contemplated for New York.... It therefore seems that the application of N.Y.C.P.L.R. § 302(a)(1) does not necessarily depend on the number of negotiating sessions or their proximity to the ultimate agreement; as long as the discussions 'significantly advance the making of a corporate contract of importance,' it would appear that the participants had transacted business within the state."

*Bastille Properties*, 476 F.Supp. at 177.

In the present case, Economidy, as president of defendant, travelled to New York to attend a demonstration of the use of SUPERSTAT in surgery, and as plaintiff contends, to negotiate a contract concerning the manufacture and marketing of SUPERSTAT. There can be no question that on this visit Economidy's presence in New York was for purposes of advancing a potential, or even existing, SUPERSTAT joint venture. Plaintiff contends that the parties also met in New York on two subsequent occasions for the purpose of negotiating a SUPERSTAT joint venture agreement. As in *American Marine*, the defendant "stood to derive considerable economic benefit from these excursions to New York," *American Marine*, 375 F.2d at 956, and did indeed derive such benefit when plaintiff sent various trademarks, trade secrets and existing inventories of SUPERSTAT to defendant in California. Defendant's conduct in New York demonstrates sufficiently purposeful activity to constitute the transaction of business under C.P.L.R. § 302(a)(1).

Defendant contends that the cases cited above, and similar cases cited in plaintiff's memorandum,[5] are distinguishable in that in those cases, the discussions in New York played a significant role in the negotiation process and ultimately led to the creation of a formal agreement. That is, the negotiations significantly advanced the formation of an agreement. Treating plaintiff's affidavit as true, as I must on this motion to dismiss, defendant's contention must be rejected. Plaintiff maintains that during the first meeting in New York, Economidy and Sawyer "discussed manufacturing details, alternative sizes and shapes for the product, potential areas of application and marketing ideas." Sawyer Affidavit ¶ 13. Subsequent to that meeting, plaintiff did ship to defendant "a complete set of trademarks for SUPERSTAT, a large quantity of raw material used in its manufacture, and volumes of documents relating to F.D.A.'s Premarket Approval which included various details of the SUPERSTAT manufacturing process." *Id.* ¶ 14. These allegations are sufficient to meet plaintiff's burden of showing that substantial negotiations took place in New York and that those negotiations significantly advanced the formation of an agreement.

Even if, as defendant contends, the parties first meeting in New York was solely for the purpose of conducting a demonstra-

---

**5.** See plaintiff's memorandum at 11–17.

tion and no negotiations took place during the meeting, jurisdiction may still be properly asserted in this case. "Meetings which are partially social in nature, as well as meetings which merely create the likelihood of a more solid business relationship are a sufficient basis for the exercise of in personam jurisdiction." *Round One Productions,* 566 F.Supp. at 937–38. The only conceivable purpose of the demonstration was to foster a more solid relationship, if not a contract, with respect to the manufacture and marketing of SUPERSTAT. The meeting did indeed have that effect, as plaintiff subsequently shipped to defendant the various materials described above. *See* Sawyer Affidavit ¶ 14. Likewise, after the second meeting, plaintiff provided defendant with a variety of information, services and products relevant to the manufacture and marketing of SUPERSTAT. Sawyer Affidavit ¶ 16. Even if the meetings in New York were partially social in nature, they demonstrated sufficiently purposeful activity in New York to justify the assertion of longarm jurisdiction.

In light of the above, I find that plaintiff has sufficiently alleged the transaction of business in New York to withstand a motion to dismiss for lack of personal jurisdiction with respect to Count 1 of the complaint.

B. *Counts 2, 3 and 4*

Count 2 alleges that plaintiff supplied defendant with various trade secrets and confidential information relating to SUPERSTAT and that, since July 20, 1984, defendant has wrongfully refused to cease using and return the trade secrets and confidential information to the plaintiff. Count 3 alleges that defendant has engaged in unfair competition by using and exploiting plaintiff's patents, trademarks, trade secrets and confidential information. Count 4 alleges that defendant has unjustly enriched itself by profiting from the sale of SUPERSTAT which defendant obtains and sells by virtue of the misappropriation and unauthorized use of plaintiff's patents, trademarks, trade secrets and confidential information. Plaintiff seeks to assert jurisdiction over defendant on these claims under either CPLR § 302(a)(1) or (3).

Jurisdiction cannot be asserted over Counts 2, 3 and 4 under CPLR § 302(a)(1). That section "requires not only that the defendant 'transact business' in the state, but that the cause of action 'arise' from the business so transacted." *Xedit Corp. v. Harvel Industries Corp., Fidelipac,* 456 F.Supp. 725, 728 (S.D.N.Y.1978), *citing Fontanetta v. American Board of Internal Medicine,* 421 F.2d 355, 357 (2d Cir. 1970). Counts 2, 3 and 4 do not arise from defendant's transaction of business in New York (the three meetings between Sawyer and Economidy in New York). Rather, these claims arise from defendant's allegedly continuing or threatened use of plaintiff's trademarks, patents and trade secrets after negotiation of the joint venture agreement had broken down and plaintiff had sent defendant the July 20, 1984 letter demanding that defendant cease and desist from making, using or selling SUPERSTAT and using defendant's various intellectual property rights concerning the manufacture and sale of SUPERSTAT. Where, as here, the New York meetings did not cause or further the alleged misappropriation of intellectual property rights "except to the extent that it was a link in the chain of events leading to the claim for which relief is sought," the misappropriation claim and related unfair competition claim cannot be said to arise from transactions of business in New York. *Xedit,* 456 F.Supp. at 729. Accordingly, the courts have uniformly held that jurisdiction will not lie under § 302(a)(1) where contract negotiations were held in New York, but the alleged misappropriation of intellectual property occurred after either the contract negotiations broke down or the contract was breached. *See American White Cross Laboratories, Inc. v. H.M. Cote, Inc.,* 556 F.Supp. 753, 759 (S.D.N.Y.1983); *Xedit,* 456 F.Supp. at 729; *Sterling Television Presentations v. Shintron Co.,* 454 F.Supp. 183, 188 (S.D.N.Y.1978).

The decision in *Sterling Television* is of particular relevance to the present case. The plaintiff in *Sterling Television* brought an action for breach of an exclusive marketing agreement and misappropriation of trade secrets. The plaintiff was a New York corporation which held various intellectual property rights concerning the manufacture of "videotypewriters". The defendant was a Massachusetts corporation. Agents of the defendant traveled to New York on several occasions to negotiate an exclusive marketing agreement. The parties subsequently entered into an agreement under which the defendant became the exclusive marketing agent for a certain videotypewriter. The agreement was terminated several months later, but the defendant continued to sell the videotypewriters and commenced manufacture of its own videotypewriters. The court held that the defendant's New York activities were sufficient to justify the assertion of § 302(a)(1) jurisdiction over the contract claim, but held that the trade secret misappropriation claims did not arise from those activities and therefore the court had no § 301(a)(1) jurisdiction over those claims.

Likewise in the present case, defendant's New York meetings justify the exercise of § 302(a)(1) jurisdiction over the cause of action for a declaration that there is no joint venture agreement. The commercial tort claims in Counts 2, 3 and 4 do not, however, arise from those meetings and therefore this Court cannot assert § 302(a)(1) jurisdiction over those claims.

Plaintiff alternatively contends that jurisdiction over Counts 2, 3 and 4 can be asserted under CPLR 302(a)(3). That section provides for jurisdiction under certain circumstances where the defendant "commits a tortious act without the state causing injury to person or property within the state ... if he ... (ii) expects or should expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."

CPLR § 302(a)(3). Defendant has not challenged plaintiff's assertion that the requirements of subdivision (ii) have been met in this case. The sole issue contested by the parties with respect to § 302(a)(3) is whether defendant's alleged activities caused an injury to plaintiff "within the state" of New York.

■ To assert jurisdiction under § 302(a)(3), "the injury within the state ... must be 'direct, and not remote or consequential.'" *Faherty v. Fender,* 572 F.Supp. 142, 149 (S.D.N.Y.1983), *citing Porcello v. Brackett,* 85 A.D.2d 917, 446 N.Y.S.2d 780 (4th Dept.1981). Thus, the New York State Court of Appeals has held that "the residence or domicile of the injured party within the State is not a sufficient predicate for jurisdiction, which must be based upon a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured party resides or is domiciled there....." *Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 787, 402 N.E.2d 122, 126 (1980). In commercial tort actions, the courts have uniformly held that the mere fact that the plaintiff resides in New York and therefore ultimately experiences a financial loss there is not a sufficient basis for jurisdiction under § 302(a)(3). *See American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.,* 439 F.2d 428 (2d Cir.1971); *Arbitron Co. v. E.W. Scripps, Inc.,* 559 F.Supp. 400 (S.D.N.Y. 1983); *Data Communications, Inc. v. Dirmeyer,* 514 F.Supp. 26 (E.D.N.Y.1981); *Stark Carpet Corp. v. M-Geough Robinson, Inc.,* 481 F.Supp. 499 (S.D.N.Y.1980); (hereafter collectively called the "*American Eutectic* cases"). *See also Connecticut Artcraft Corp. v. Smith,* 574 F.Supp. 626 (D.Conn.1983) (applying the Connecticut longarm statute which is "nearly identical" to CPLR § 302(a)(3)).[6] In all of these

---

6. Plaintiff cites two recent Supreme Court cases as standing for the proposition that the plaintiff's domicile in the forum state may play an important role in justifying the assertion of jurisdiction in that state. *Calder v. Jones,* ⸺ U.S. ⸺, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Keeton v. Hustler Magazine,* ⸺ U.S. ⸺, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). These cases

cases, the courts held that the place of injury was where the defendant conducted the allegedly improper sale of goods or services or wrongfully manufactured the goods.

Typical of these cases is *Arbitron*, where the claims for copyright infringement and related torts were brought in federal district court in New York against a Tennessee defendant. The plaintiff, the Arbitron Company, alleged that the defendant had obtained unauthorized access to Arbitron's estimates of radio and television audiences and that the defendant had used those estimates to prepare comparative advertising brochures that were distributed in and around Memphis, Tennessee. 559 F.Supp. at 401. The only tie of the alleged tort to New York was that the plaintiff resided there and the plaintiff claimed to have suffered financial loss or loss of good will in the state. *Id.* at 404. The court held that

> "[t]hese are inadequate links. Both would have been suffered by the plaintiff, if indeed they did occur, wherever it resides. Further, if the plaintiff lost any business as a result of defendant's action, such business was lost in Memphis.... To hold to the contrary would allow courts to exercise jurisdiction over all out-of-state defendants provided that the plaintiff resides in New York and claims a loss of good will. No jurisdiction is present under CPLR § 302."

*Id.*

■ Defendant contends that the *American Eutectic* cases should control the present case because defendant did not make any allegedly improper sales of SUPERSTAT in New York and therefore any injury suffered by plaintiff in New York was solely the result of plaintiff's residence in the state. Plaintiff argues that all of those cases should be distinguished be-

cause they involved the allegedly improper manufacture or sale of goods or services that violated the respective plaintiff's rights in their intellectual property. Plaintiff maintains that it is not engaged in the business of manufacturing or selling goods utilizing various intellectual property rights, but that its business is actually the sale of the intellectual property rights. Plaintiff contends that defendant's allegedly present or threatened future sales of SUPERSTAT create a cloud over plaintiff's title to its various rights concerning SUPERSTAT, thereby damaging plaintiff's business by impeding its ability to sell those rights in New York. In support of this position, plaintiff cites *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1981). In *Sybron*, a manufacturer and reliner of glass-lined vessels brought suit against a former employee and a nonresident competitor to enjoin the competitor's hiring of the employee and to prevent a disclosure of the plaintiff's trade secrets. The Court of Appeals held that jurisdiction existed under § 302(a)(3) for the purely prospective relief sought by the plaintiff, where the "economic injury the plaintiff seeks to avert stems from the threatened loss of important customers." *Id.*, 46 N.Y.2d at 205, 413 N.Y.S.2d 127, 385 N.E.2d 1055. The court noted that the defendant corporation had already solicited and secured an order from one of the plaintiff's major New York customers. *Id.* at 205–06, 413 N.Y.S.2d 127, 385 N.E.2d 1055.

Plaintiff's attempt to distinguish the *American Eutectic* cases is plainly unavailing with respect to Count 4 of the complaint. Count 4 alleges that defendant was unjustly enriched by the sales of SUPERSTAT which it obtained and sold in violation of plaintiff's various intellectual property rights. This claim cannot be construed as only an action to quiet title in plaintiff's

are inapplicable in the present case because they address the constitutionally permissible scope of jurisdiction. At issue in this case is the narrower scope of jurisdiction permitted under New York's Civil Practice Law and Rules. *See* note 3 *supra*. As discussed above, the New York Court of Appeals has unequivocally stated that under CPLR 302(a)(3), residence or domicile of the plaintiff within the state is not a

sufficient basis upon which to assert jurisdiction. *Fantis Foods*, 49 N.Y.2d at 326, 425 N.Y. S.2d 783, 402 N.E.2d 122. Furthermore, both *Calder* and *Keeton* addressed the unique jurisdiction problems inherent in libel actions arising from publications in a national newspaper or magazine. The jurisdictional issues presented in this case differ significantly from those raised in such libel actions.

intellectual property rights. It is nothing more than a claim for damages arising from defendant's allegedly improper manufacture and sale of SUPERSTAT. As such, Count 4 is controlled by the *American Eutectic* cases. Since plaintiff has not made any allegation of lost sales from customers of SUPERSTAT in New York (and indeed maintains that it does not sell SUPERSTAT), jurisdiction over Count 4 cannot be asserted under § 302(a)(3).

A more difficult question is whether the *American Eutectic* cases should control with respect to Counts 2 and 3. As discussed above, in all those cases and in *Sybron*, the critical inquiry was whether the plaintiff suffered injury within New York solely because they resided in the state, or whether there were additional factors placing the injury in New York. Perhaps the most pragmatic means of approaching this inquiry is to ask whether any injury would still have occurred within New York if the plaintiff had resided in another state. To phrase it differently, whether the injury would have occurred wherever the plaintiff resided. *See Arbitron*, 559 F.Supp. at 404. In the *American Eutectic* cases, there would have been no injury in New York if the respective plaintiffs had not resided in New York. In each of those cases, the courts found no jurisdiction under § 302(a)(3). In *Sybron*, there would still have been an injury in New York, the threatened loss of a major New York customer, if the plaintiff had not resided in New York. The court upheld jurisdiction in that case.

In the present case, the plaintiff has not offered any evidence indicating that there would be injury to plaintiff in New York if plaintiff resided in another state. Plaintiff has not specified any actual or threatened loss of customers in New York for its intellectual property rights. Indeed, plaintiff has not shown why, apart from plaintiff's New York residence, the alleged cloud over its title to the various SUPERSTAT rights will have any effect in New York that is different from the effect it will have in the other 49 states: impeding plaintiff's ability to sell its SUPERSTAT rights *anywhere*. At most, plaintiff is contending

in essence that it is injured in New York because its intellectual property rights, as intangible property, must be located wherever plaintiff is located. The Supreme Court has noted, however, that "intangible property has no actual situs" and the fictional presence accorded such property by law "can have no jurisdictional significance." *Rush v. Savchuk*, 444 U.S. 320, 328–30, 100 S.Ct. 571, 577–78, 62 L.Ed.2d 516 (1980). I therefore conclude that under the *American Eutectic* cases, plaintiff did not suffer the injuries alleged in Counts 2 and 3 within New York. This Court cannot assert jurisdiction over those claims under CPLR § 302(a)(3).

For the reasons discussed above, defendant's motion to dismiss for lack of personal jurisdiction over the defendant is denied with respect to Count 1, but granted with respect to Counts 2, 3 and 4.

Defendant has also moved to dismiss Counts 3 and 4 of the complaint for improper venue, insofar as those Counts seek relief for patent infringement. In light of the determination that the Court lacks personal jurisdiction over the defendant with respect to Counts 2, 3 and 4, and the representation of plaintiff's attorney that plaintiff is not asserting a patent infringement claim, I find it unnecessary to decide defendant's motion regarding venue.

SO ORDERED.